UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. **4:24-cr-436- RWS** |
| | ) | |
| RICHARD CHARLES APPELBAUM III, | ) | |
| | ) | |
| Defendant. | ) | |

## **GUILTY PLEA AGREEMENT**

Come now the parties and hereby agree, as follows:

### 1. **PARTIES:**

The parties are the defendant Richard Charles Appelbaum, III, represented by defense counsel Justin K. Gelfand, and the United States of America (hereinafter "United States" or "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

### 2. **GUILTY PLEA:**

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary plea of guilty to Count I of the Information, the United States agrees that no further federal prosecution will be brought in this District relative to the defendant's fraud and money laundering scheme occurring between February 2022 and December 2023, of which the Government is aware at this time.

1

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree that either party may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a). The parties further agree that notice of any such request will be given no later than ten days prior to sentencing and that said notice shall specify the legal and factual bases for the request.

The defendant also agrees, pursuant to the guilty plea to Count I, to forfeit to the United States all property subject to forfeiture under the applicable statute(s), including but not limited to: $95,000 in U.S. currency seized from Bank of America account ending in #8710 held in the name of MGA Global Enterprises LLC on April 19, 2023.

## 3. **ELEMENTS:**

As to Count I, the defendant admits to knowingly violating Title 18, United States Code, Section 1956(h), and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

(1) on or before February 1, 2022, two or more persons reached an agreement to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activities, that is, wire fraud in violation of Title 28, United States Code, Section 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, and that while conducting the financial transactions, knew that

2

the property involved in the financial transactions represented the proceeds of some form of unlawful activity;

(2) the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and

(3) at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding.

## 4. FACTS:

The parties agree that the facts in this case are as follows and that the government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

1.      Beginning in or about February 2022, and continuing through at least in or about December 2023, in the Eastern District of Missouri, and elsewhere, the defendant knowingly combined, conspired and agreed with others, including S.W., E.S., V.L., L.B., J.D., C.L., to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activities, that is, wire fraud in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, and that while conducting the financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

2.      In 2022, the defendant began communicating with S.W. on Facebook Messenger regarding real estate. After a few weeks of discussions, S.W. told the defendant that he worked at Coins2Trade.

3

3.      In August 2022, S.W. introduced the defendant to E.S. on WhatsApp and described E.S. as "a big player in crypto" with Coins2Trade.  E.S. told the defendant that Coins2Trade was a cryptocurrency transaction processor for people who do not have the ability to purchase cryptocurrency based on where they lived.  E.S. offered to hire the defendant as an "investment banker" at Coins2Trade.  As part of this job, the defendant would receive large wire transactions of U.S. currency and convert it into cryptocurrency.  E.S. told the defendant that he would receive a 3% commission on any cryptocurrency transactions that he processed and that Coins2Trade would take care of any taxes due and owing related to the transactions.

4.      Between August 2022 and October 2022, E.S. trained the defendant to process cryptocurrency payments.  This training occurred through WhatsApp messages and phone calls, generally between the hours of 10pm and 3am CST.  E.S. instructed the defendant to create business entities, to open numerous business bank accounts and personal bank accounts at various banks, and to open accounts at various cryptocurrency exchanges under his own name.  The defendant was told to provide the account information for these accounts to E.S.  E.S. told the defendant that he should only open bank accounts with certain banks.  E.S. further told the defendant how to dress and act when meeting with bank personnel, including that the defendant should never tell bank personnel that he was dealing with cryptocurrency.  E.S. further told the defendant that he should use the debit cards tied to the accounts at least once per day to make the accounts appear legitimate.

5.      During his discussions with E.S., the defendant learned that L.B., J.D., and C.L., were also working with E.S. and Coins2Trade.  E.S. also told the defendant that he could make money by recruiting others to help move money from bank accounts to cryptocurrency accounts.  As a result, in January 2023, the defendant recruited A.G. to process cryptocurrency transactions.

4

The defendant told A.G. that he would earn a 2.5% commission on each transaction and that he would make approximately $20,000 per month.  The defendant instructed A.G. to open bank accounts and cryptocurrency accounts.  The defendant further instructed A.G. to use the bank accounts for personal expenditures so that they appeared legitimate.

6.      Between February 2022 and January 2023, the defendant and other co-conspirators formed numerous business entities, including, but not limited to, APM Management Service's LLC ("APM"), JMD Consultant Services LLC ("JMD") and MGA Global enterprises llc ("MGA").  On the corporate organization documents for these entities, the defendant and his co-conspirators variously stated that the purposes of these entities were auto purchasing consulting, boating supplies, real estate management, and life skills consulting.  All of these stated purposes were false.  In truth and fact, these entities were created for the sole purpose of demonstrating apparent legitimacy to financial institutions when accounts held in the entity names received large wire deposits.

7.      Between February 2022 and April 2023, the defendant and other co-conspirators opened at least twenty-four (24) business bank accounts at various financial institutions for the sole purpose of receiving and moving currency, including but not limited to: Bank of America account ending in #5416 held in the name of APM (APM #5416), Commerce Bank account ending in #0993 held in the name of APM (APM #0993), Bank of America account ending in #5762 held in the name of JMD (JMD #5762), and Bank of America account ending in #8710 held in the name of MGA (MGA #8710).  During the opening of these accounts, and in further communications with the financial institutions, the defendant and his co-conspirators made false statements regarding the entities and the source and purpose of the funds being deposited into the accounts.

8.      Between February 2022 and February 2023, no less than 36 individuals and entities across the United States and outside the United States were victimized by and through a Business Email Compromise (BEC) wire fraud scheme wherein unknown criminal actors infiltrated victim email accounts and caused email messages to be sent directing the payment of monies to specific bank accounts held by the defendant and his co-conspirators.  For example,

a.      On December 12, 2022, Victim 1 (a title company based in Florida acting as the escrow agent for the sale of Victim 2's commercial property in Mississippi) received a fraudulent email purporting to be from Victim 2 with instructions to wire escrowed funds to the defendant's account APM #5416.  In truth and fact, Victim 2 did not request that Victim 1 make any payments to APM #5416.  In reliance on the fraudulent email message, Victim 1 wired $2,258,274 to APM #5416.  On December 27, 2022, at the direction of E.S., the defendant spoke to an attorney for Victim 1 and falsely stated that the monies paid to APM were due to him by and through a written agreement wherein the defendant was to provide real estate consulting services for Victim 1 through G.D.  The defendant further stated that he would provide documentation to Victim 1 showing APM's vendors, the defendant's communications with G.D., and an invoice for the sum of $2,258,274 that was owing to APM.  On July 13, 2023, the defendant was deposed as part of a civil federal lawsuit brought by Victim 1.  During the deposition, the defendant provided false testimony that he had a business relationship with G.D.

b.      On January 10, 2023, Victim 3 (a company with locations in Texas and Florida) received a fraudulent email message purporting to be from Victim 4 (one of Victim 3's suppliers) with instructions to wire funds to JMD #5762.  In truth and fact, Victim 4 did not request that Victim 3 make any payments to JMD #5762.  Between January 12 and 18, 2023, in reliance on the fraudulent email message, Victim 3 made ten ACH payments to JMD #5762 totaling

6

$421,205.35. After the funds were sent by Victim 3, the defendant instructed J.D. to transfer the funds to J.D.'s personal bank accounts, to cryptocurrency accounts, and to the defendant's account APM #0993. The defendant further instructed J.D. to mark these transactions as either employee salaries or gifts. The defendant used some of these funds to pay his attorney's fees to his civil legal counsel associated with the civil federal lawsuit filed by Victim 1 against the defendant.

c.      On November 28, 2022, Victim 5 (a company based in Winnipeg, Manitoba, Canada) wired $121,485.00 to APM #0993 based on a fraudulent email purporting to be from Victim 6 (a supplier for Victim 5) with instruction to wire funds to the defendant's account APM #0993. On February 13, 2023, Victim 5 wired another $121,485.00 to the defendant's account APM #0993 based on a fraudulent email purporting to be from Victim 6. In truth and fact, Victim 6 did not request that Victim 5 make any payments to APM #0993. On March 1, 2023, the defendant wired $95,000 of these fraudulent proceeds to MGA #8710. On the same day, the defendant met with FBI agents and provided his computer wiped of all the data related to the conspiracy.

9.      Between February 2022 and April 2023, the defendant and other co-conspirators opened additional personal bank accounts and accounts with cryptocurrency trading platforms. The defendant and other co-conspirators followed a general pattern of moving the criminal proceeds of wire fraud from the business accounts to personal bank accounts, and then to accounts at cryptocurrency trading platforms (including Bam Trading Services, Inc DBA Binance US; West Realm Shires (FTX US); Crypto.com; Ok Coin; BitStamp; Bittrex Inc; Coinbase; and Prime Trust LLC) to purchase cryptocurrency. This cryptocurrency was then transferred to other accounts.

10.     Over the course of the conspiracy, the defendant and his co-conspirators, including L.B., J.D., C.L., D.B., M.N, and A.G., received at least 34 wire transfers totaling $8,344,287.57.

All of these funds were proceeds of wire fraud involving victims of the aforementioned BEC fraud scheme or an online romance scheme. The defendant and his co-conspirators transferred the majority of the available funds from these wire transfers to various cryptocurrency accounts and then used them to purchase bitcoin and other cryptocurrency. The defendant knew that the wire transfers involved the proceeds of some form of unlawful activity and knew that the transfer of the proceeds to cryptocurrency accounts was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds.

11. Although the defendant knew that the amount of proceeds laundered during the conspiracy exceeded $3,500,000, he lacked actual knowledge of the full amount of funds laundered as part of the conspiracy.

## 5. STATUTORY PENALTIES:

The defendant fully understands that the maximum possible penalty provided by law for the crime to which the defendant is pleading guilty is imprisonment of not more than twenty (20) years, a fine of not more than $250,000 or twice the amount of the criminally derived property involved in the transactions, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than three years.

## 6. U.S. SENTENCING GUIDELINES (2023 MANUAL):

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the applicable U.S. Sentencing Guidelines Total Offense Level provisions.

### a. Chapter 2 Offense Conduct:

8

(1) **Base Offense Level:** The parties agree that the base offense level is **Twenty-Six (26)**, calculated as 8 plus 18 (from Section 2B1.1(b)(1)(J)), as found in Section 2S1.1(a)(2).

(2) **Specific Offense Characteristics:** The parties agree that the following Specific Offense Characteristics apply: **Two (2)** levels should be added pursuant to Section 2S1.1(b)(2)(B) because the count of conviction is a violation of 18 U.S.C. § 1956. **Four (4)** levels should be added pursuant to Section 2S1.1(b)(2)(C) because Section 2S1.1(a)(2) applies and the defendant was in the business of laundering funds.

b. **Chapter 3 and 4 Adjustments:**

(1) **Acceptance of Responsibility:** The parties recommend that two levels should be deducted pursuant to U.S.S.G. § 3E1.1(a) because defendant has clearly demonstrated acceptance of responsibility. If this deduction is applied, and if Defendant is otherwise eligible, then the Government moves to deduct one additional level pursuant to U.S.S.G. § 3E1.1(b), because Defendant timely notified authorities of the intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the government receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the government may present said evidence to the court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

(2) **Adjustment for Certain Zero-Point Offenders:** If the Court determines that the defendant does not receive any criminal history points from Chapter 4, Part A, then the parties

9

agree that two levels should be deducted under Section 4C1.1(a), because the defendant meets all of the criteria under Section 4C1.1(a)(2) through (a)(10).

**(3)   Other Adjustments:**   The parties agree that the defendant may seek an adjustment based on Section 5H1.6 based on requirements and care for his family, specifically his minor children.

**d.  Estimated Total Offense Level:**   The parties estimate that the Total Offense Level is **Twenty-Nine (29)** unless a two-level reduction under Section 4C1.1(a) applies based on the Court's determination of the defendant's criminal history and before consideration of an adjustment based on Section 5H1.6.

**e.  Criminal History:**   The determination of the defendant's Criminal History Category shall be left to the Court.  Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category.   The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**f.  Effect of Parties' U.S. Sentencing Guidelines Analysis:**   The parties agree that the Court is not bound by the Guidelines analysis agreed to herein.  The parties may not have foreseen all applicable Guidelines.  The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

## 7.  WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:

**a.  Appeal:**  The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1)** **Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery and the guilty plea.

**(2)** **Sentencing Issues:** The parties agree to waive the right to appeal all sentencing issues except those related to: (1) application of Sentencing Guideline offense-level adjustments (including those based on criminal history) not specifically set forth in the plea agreement or non-application of adjustments specifically set forth in the agreement; (2) calculation of the defendant's criminal history category; or (3) substantive reasonableness of the sentence—above the Guideline range ultimately determined by the Court for appeals taken by the defendant, or below that range for appeals taken by the Government.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER:**

**a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to

sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

b. **Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

c. **Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished

d. **Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $100, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

e. **Possibility of Detention:** The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

f. **Fines, Restitution and Costs of Incarceration and Supervision:** The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision. The defendant agrees that any fine or restitution imposed by the Court will

be due and payable immediately.  Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c).  Regardless of the Count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss.  The defendant agrees to provide full restitution to all victims of all charges in the indictment.

 **g.  <u>Forfeiture</u>:**  The defendant knowingly and voluntarily waives any right, title, and interest in all items seized by law enforcement officials during the course of their investigation, whether or not they are subject to forfeiture, and agrees not to contest the vesting of title of such items in the United States.  The defendant agrees to abandon his interest in all seized items and further agrees that said items may be disposed of or destroyed by law enforcement officials in any manner without further notice.  By abandoning these items, the defendant waives any future rights to receive additional notice, a valuation of the items, or the opportunity to submit a claim to contest the disposition or destruction of the items that may exist under any policies or procedures of the seizing agency(ies).

 The defendant agrees the stipulated facts above are sufficient to support forfeiture of certain assets pursuant to the applicable forfeiture authorities.  Defendant specifically agrees to the forfeiture of the following:  $95,000 in U.S. currency seized from Bank of America account ending in #8710 held in the name of MGA Global Enterprises LLC on April 19, 2023.  Defendant also agrees to the entry of a forfeiture money judgment against the defendant and in favor of the Government in the amount of $8,344,287.57. The defendant agrees the Court may enter a consent preliminary order of forfeiture any time before sentencing, and such Order will become final as to the defendant when it is issued and will be part of the sentence.  The defendant agrees not to object to any administrative, civil, or criminal forfeiture brought against any assets subject to forfeiture.

The defendant will execute any documents and take all steps needed to transfer title or ownership of said assets to the government and/or to rebut the claims of nominees and/or alleged third party owners. The defendant knowingly and intelligently waives all constitutional, statutory, and equitable challenges to any forfeiture carried out in accordance with this plea agreement, including but not limited to that defendant was not given adequate notice of forfeiture in the charging instrument.

The United States Attorneys Office for the Eastern District of Missouri agrees to make a non-binding recommendation to the Money Laundering and Asset Recovery Section that any forfeited property be allocated to, and credited against, any restitution that may be ordered by this Court.

## 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the

14

proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the government's evidence and discussed the government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the government's case and any defenses.

The guilty plea could impact defendant's immigration status or result in deportation. In particular, if any crime to which defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

## 10. **VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:**

This document constitutes the entire agreement between the defendant and the government, and no other promises or inducements have been made, directly or indirectly, by any agent of the government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT:

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the government agrees to dismiss or not to bring.

8/23/24
_____
Date

_____
Kyle T. Bateman
Assistant United States Attorney

8/23/24
_____
Date

_____
Richard Charles Appelbaum, III
Defendant

8/23/24
_____
Date

_____
Justin K. Gelfand
Attorney for Defendant